**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN P. KOIVULA, | ) | CASE NO. 1:23-CV-01345-BYP |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| | ) | BENITA Y. PEARSON |
| v. | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff, John P. Koivula ("Mr. Koivula"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF No. 1.) This matter is before me pursuant to 42 U.S.C. §§ 405(g) and Local Rule 72.2(b). (ECF non-document entry dated July 12, 2023.) For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

## II.      PROCEDURAL HISTORY

On February 16, 2021, Mr. Koivula filed applications for DIB and SSI, alleging a disability onset date of March 2, 2020. (Tr. 192, 195.)[2] His applications related to blindness/low vision, history of cerebrovascular accident, vertebral artery dissection, vertigo, hemiplegia, keratitis, keratoprosthesis, essential hypertension, anxiety, depression, and chronic left-sided pain with

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.
[2] The administrative transcript ("Tr.") appears at ECF No. 5 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record references are to the electronically stamped CM/ECF document ("ECF No.") and PageID# rather than any internal pagination.

1

sciatica. (*See* Tr. 71.) The ALJ's decision also found the following severe impairments: status post cerebral vacular accident[3] due to right vertebral artery dissection, occlusion, hemiplegia, obesity, diabetes mellitus, left eye keratoplasty and glaucoma, neuropathy, lumbar degenerative disc disease, major depressive disorder, cervical stenosis, and a generalized anxiety disorder. (Tr. 18.) Mr. Koivula's applications were denied initially and upon reconsideration. (Tr. 132-29.)

An administrative law judge ("ALJ") held an administrative hearing on August 15, 2022. (Tr. 36-64.) Mr. Koivula, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) The ALJ issued a written decision on August 31, 2022, finding Mr. Koivula was not disabled within the meaning of the Social Security Act. (Tr. 16-30.) The Commissioner's decision became final on May 9, 2023, when the Appeals Council declined further review. (Tr. 1-7); *see* 20 C.F.R. §§ 404.900(a)(5), 416.1400(a)(5). Mr. Koivula filed a Complaint on July 11, 2023. (ECF No. 1.) He asserts the following assignments of error:

(1) The ALJ erred when she failed to find at Step Three of the Sequential Evaluation that Plaintiff satisfied or equaled the criteria of Listing 11.04.

(2) The ALJ erred at Step Two of the Sequential Evaluation when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.

(3) The ALJ erred when she improperly assessed the opinions of the treating and examining sources and failed to support her conclusions with substantial evidence.

(4) ALJ erred at Steps Four and Five of the Sequential Evaluation when she found Plaintiff did not require the use of a walker when standing.

(ECF No. 7, PageID#2281.)

---

[3] Cerebral vascular accident ("CVA"), also known as a stroke, occurs when a blockage in an artery prevents blood from reaching cells in the brain or an artery ruptures inside/outside the brain, causing a hemorrhage. *Understanding Stroke*, GEO. WASH. U. HOSP., https://www.gwhospital.com/conditions-services/neurosciences-institute/understanding-stroke (last visited May 20, 2024).

### III.    BACKGROUND[4]

#### A.  <u>Personal, Educational, and Vocational Information</u>

Mr. Koivula was born in 1973, and he was 46 years on the alleged disability onset date. (Tr. 28.) He is single and has no children. (Tr. 1170.) He has a driver's license. (Tr. 44.) He graduated from high school and took some classes in college. (*Id.*) His past relevant work was employment as an electronics assembler, van driver, taxi driver, interpreter, and auditor (Tr. 28, 60.)

#### B.  <u>Relevant Non-Medical/Medical Opinion Evidence</u>

##### 1.  *State Agency Opinions*

In July 2021, Mehr Siddiqui, M.D., reviewed the record at the initial level of consideration. Dr. Siddiqui opined that Mr. Koivula could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (Tr. 77.) Dr. Siddiqui opined that Mr. Koivula could occasionally climb ramps/stairs and crawl; frequently stoop, kneel, and crouch; and never climb ladders/ropes/scaffolds. (*Id.*) Dr. Siddiqui further opined that Mr. Koivula should avoid tasks requiring depth vision and should be able to handle small and large objects and read small and large prints. (Tr. 78.) Dr. Siddiqui also opined that Mr. Koivula should avoid all exposure to hazards such as unprotected heights, heavy machinery, and commercial driving. (Tr. 78.) Leon Hughes, M.D., reviewed the record at the reconsideration level in February 2022 and agreed with Dr. Siddiqui's findings. (Tr. 99-100.)

##### 2.  *Bilal Mahmood, M.D.*

In June 2021, Dr. Mahmood conducted a consultative examination of Mr. Koivula. Mr. Koivula reported to Dr. Mahmood that his typical daily activities consisted of cooking, doing

---

[4] Mr. Koivula's assignments of error focus on the ALJ's assessment of his physical impairments. Accordingly, this summary will focus on the evidence related to those impairments.

laundry, washing dishes, using the internet, and caring for pets. (Tr. 1170.) Dr. Mahmood noted that Mr. Koivula came to the examination with a rollator walker but was able to walk around the examination room without it. (Tr. 1171.) Mr. Koivula's gait was steady and symmetric. (*Id.*) There was tenderness in his paraspinal muscles. (Tr. 1172.) He could rise from a seated position but had moderate difficulty with squatting and rising from that position, getting up and down from the exam table, and heel and toe walking. (*Id.*) He could not stand or hop on one foot bilaterally or tandem walk. (*Id.*) His range of motion in the thoraco-lumbar spine was restricted to 60/90 degrees with flexion and 10/25 degrees with extension. (*Id.*) Dr. Mahmood assessed the following diagnoses: blindness in the left eye, history of CVA, anxiety, depression, and chronic back pain. (Tr. 1172.)

Dr. Mahmood observed that Mr. Koivula had tenderness to palpation with low back paraspinal muscles and poor balance, and he used a walker to ambulate. (Tr. 1172.) Dr. Mahmood thus opined that Mr. Koivula is "significantly limited" based on those findings. (Tr. 1173.) Dr. Mahmood also opined that Mr. Koivula has no limitations with sitting, and that his ability to stand was limited to 30 minutes at a time and three hours total in an eight-hour workday. (*Id.*) Dr. Mahmood added that Mr. Koivula required the use of a rollator walker for short and long distances and uneven terrain, but also opined that Mr. Koivula would be able to lift and carry 55-pound objects frequently. (*Id.*) Dr. Mahmood also opined that Mr. Koivula would be able to occasionally bend stoop, crouch, and squat. (*Id.*)

### 3.   *Gabor Toth, M.D.*

In July 2022, Gabor Toth, M.D., Mr. Koivula's endovascular surgeon, partially completed a "Stroke Medical Source Statement." (Tr. 2246-49.) Dr. Toth noted that Mr. Koivula's balance problems, vertigo/dizziness, pain, weakness, double/blurred vision, and "other sensory

disturbance" reduced his ability to work. (Tr. 2246.) Yet, Dr. Toth did not include a specific vocational assessment. (*See generally* Tr. 2246-49.) Dr. Toth opined that Mr. Koivula did not have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbances of gross and dexterous movement or gait and station. (Tr. 2246.) Dr. Toth opined that Mr. Koivula needed to avoid even moderate exposure to extreme cold/ extreme heat; fumes, odors, and gases; soldering fluxes; and hazards, as well as concentrated exposure to high humidity, wetness, and dust. (Tr. 2248.) Dr. Toth deferred all remaining questions about Mr. Koivula's functional limitations. (Tr. 2247-49.) In support of his opinion, Dr. Toth attached his April 2022 treatment note. (Tr. 2250-58.)

### C.  Relevant Medical Evidence

On March 3, 2020, Mr. Koivula was admitted to Cleveland Clinic with complaints of vertigo, nausea, a headache, and right arm weakness after taking "concentrated street [m]arijuana." (Tr. 277, 1013, 1020, 1023.) An MRI showed acute right-sided posterior circulation infarctions, including involvement of the medulla, and dissection of the non-dominant right vertebral artery with occlusion at the C1 level. (Tr. 277.) Mr. Koivula was treated for a stroke as an inpatient for one week and then discharged to the Rehabilitation Hospital on March 10, 2020, where he remained until March 25, 2020. (Tr. 277-732.) At discharge, his condition was improved with no abnormal medical signs apparent on examination. (Tr. 287-88.)

On April 7, 2020, Mr. Koivula attended an initial endovascular telephone consultation. He reported that his balance was not normal, and he was using a cane or "roll-aid" for walking. (Tr. 772.) He reported receiving home physical therapy and feeling overall better. (*Id.*) He reported no headaches and decreased sensation on the left side of his body. (*Id.*) The recommendations included continued physical therapy, the use of prescription Plavix, and establishing care with a

primary physician. (Tr. 776.) On June 30, 2020, Mr. Koivula began outpatient physical therapy, during which he reported requiring the use of a cane to ambulate and presented with impaired posture, balance, coordination, and activity tolerance. (Tr. 784.) Repeat imaging showed healing and recanalization of the previous right vertebral artery occlusions. (Tr. 755, 1281-85.)

At a July 6, 2020, follow-up appointment at the Cleveland Clinic, Mr. Koivula endorsed impaired balance but presented with no difficulties balancing or ambulating on examination. (Tr. 1072-73, 1077.) However, he did present with pitting edema in his legs, mild pain due to left leg neuropathy, and left eye blindness. (Tr. 1072-73, 1077.) At an August 7, 2020, physical therapy appointment, Mr. Koivula demonstrated difficulty with core, control, endurance, and high level balance but improvement with activity tolerance. (Tr. 735.) He admitted to having not been performing his home exercise program due to being "busy with home projects (painting [the] fireplace)." (*Id.*) Approximately two weeks later, he established care with occupational and speech therapists. (Tr. 739, 745-46.) He presented with impairments of left hand strength, difficulty with shoe tying and buttons, and limitations with carrying objects in the kitchen. (Tr. 739.)

Mr. Koivula was re-evaluated in the endovascular surgery center on August 25, 2020, at which time he reported that his balance was still not normal. (Tr. 750.) On examination, he reported chronic imbalance and walked with a cane. (Tr. 754.) Gabor Toth, M.D., advised Mr. Koivula to continued daily aspirin; continue physical, occupational, and speech therapy; take environmental precautions; follow up with his primary care provider; and return to care as needed. (Tr. 755.)

At a September 15, 2020, speech language therapy visit, the "Plan of Care" section of the treatment notes indicated that Mr. Koivula presented with impairments of very mild cognitive linguistic deficits and continued dysphagia. (Tr. 763.) The speech therapist opined that Mr.

Koivula may benefit from skilled speech therapy services to improve cognition and swallowing. (*Id.*)

Mr. Koivula completed occupational therapy on October 13, 2020. (Tr. 821.) The occupational therapist noted that Mr. Koivula was "able to use [his] left arm for all home and instrumental activities of daily living tasks." (*Id.*) The occupational therapist also noted that Mr. Koivula was still experiencing balance issues and recommended that he return to physical therapy. (*Id.*)

At a November 3, 2020, speech language therapy appointment, Mr. Koivula exhibited difficulty with swallowing and improvements in his cognitive linguistic skills. (Tr. 832.) However, he continued to be limited with pharyngeal swallow function. (*Id.*) He was progressing as expected towards his therapy goals as demonstrated by improvements with cognitive linguistic skills. (*Id.*)

Mr. Koivula returned to physical therapy on November 13, 2020. His physical therapist noted that Mr. Koivula continued to have balance issues and was limited with walking, stair negotiation, and recreational activities. (Tr. 838.) The physical therapist further noted that Mr. Koivula was progressing slower than expected towards this therapy goals due to non-compliance with his appointment attendance and performance of his home exercise program. (*Id.*)

On January 12, 2021, Mr. Koivula's physical therapist noted "[o]verall improved balance since start of care [and] decreased risk for falls based on functional testing, but continues to have most difficulty with balance with head turns." (Tr. 925.) The physical therapist also noted Mr. Koivula continued "to have most difficulty with balance with head turns…[and] to be limited with walking in the community." (*Id.*)

On January 18, 2021, Mr. Koivula reported headaches, but his physical examination was otherwise normal. (Tr. 1089.) Sean Battisti, M.D., noted that he believed Mr. Koivula's headaches

are "likely secondary to his [history] of CVA" and recommended that he consult with a headache specialist. (Tr. 1090.)

Mr. Koivula attended an initial consult for his headaches with Luzma Cardona, M.D. on January 26, 2021. Mr. Koivula told Dr. Cardona that he experienced a headache a few days after his stroke in March 2020. (Tr. 949.) Dr. Cardona assessed that Mr. Koivula had a persistent headache attributed to past ischemic stroke. (Tr. 951.) On February 23, 2021, Mr. Koivula exhibited difficulty with functional balance with his eyes closed, but he demonstrated improvement in his ability to balance with less postural sway with his eyes closed and on compliant surfaces compared to his initial assessment. (Tr. 1056.) His physical therapist noted that Mr. Koivula continued to be limited with high-level balance in dynamic environments, and balance with eyes closed to perform activities of daily living such as grooming and dressing tasks. (Id.)

At a February 24, 2021, appointment, Mr. Koivula's physical examination was normal except for some crepitus in his left knee. (Tr. 1094.) Mr. Koivula's physical examination was normal at a March 1, 2021 appointment. (Tr. 1100.) The following day, Mr. Koivula reported at his physical therapy appointment having "good and bad days" related to balance and demonstrated difficulty simultaneously turning his head and moving his arms with his eyes closed. (Tr. 890.)

On March 16, 2021, Mr. Koivula's physical therapist tested Mr. Koivula's gait, noting he was full weightbearing, could walk 300 feet independently, and did not use a gait device but further noted that his heel strike during initial stance, cadence, and step length were decreased. (Tr. 1135.) At a March 26, 2021, cardiology appointment, Mr. Koivula reported no headaches. (Tr. 1142.) His physical examination findings were normal. (Tr. 1142-43.) He did report walking at home using furniture or a cane for support, but his physical exam made no reference to him using a cane. (Tr. 1140; *see* Tr. 1142-43.) At a March 21, 2021 physical therapy appointment, his physical therapist

noted Mr. Koivula had no gait device. (Tr. 1147.) That course of physical therapy was discontinued after 20 sessions on April 13, 2021. (Tr. 1150.) A physical examination from Mr. Koivula's cardiologist on April 23, 2021, yielded normal findings. (Tr. 1156.)

On June 5, 2021, Mr. Koivula attended a consultative examination with Bilal Mahmood, M.D. (Tr. 1168-78.) A summary of the findings is located in the "Non-Medical/Medical Opinion Evidence" section of this Report and Recommendation.

On July 1 and July 20, 2021, Mr. Koivula presented with no relevant, abnormal medical signs. (Tr. 2164, 2207.) On August 4, 2021, Mr. Koivula presented with a cane to an orthopedic appointment. (Tr. 2137.) He ambulated in casual athletic shoes and an antalgic gait. (*Id.*) He exhibited full neurological senses and full muscle strength in his lower extremities with "very limited" left ankle ranges of motion. (*Id.*)

Mr. Koivula resumed physical therapy in September 2021 due to left heel pain affecting his abilities to walk and negotiate stairs. (Tr. 1201.) On October 19, 2021, Mr. Koivula attended a physical therapy appointment. He exhibited improvement in his overall activity tolerance but continued to have widespread pain along his left lower extremity. (Tr. 1191.) He continued to be limited with standing, walking, heavy, exertion, lifting, and squatting. (*Id.*) Mr. Koviula continued to attend physical therapy through December 8, 2021, during which his Achilles tendonitis "completely resolved," though he reported some back and hip pain and hypersensitivity, as well as bouts of burning sensation in his left foot and ankle. (Tr. 1191-1205, 1441-82.) He presented with no relevant abnormalities during a routine office visit during that span. (Tr. 1864-65, 2015-16.)

On April 18, 2022, Dr. Toth observed that Mr. Koivula ambulated with a cane at an endovascular evaluation. (Tr. 1800.) Treatment notes from a routine office visit on May 6, 2022,

indicated that Mr. Koivula was ambulating with a cane. (Tr. 1744.)   At a pain management evaluation five days later, Mr. Koivula was again noted to ambulate with a cane. (Tr. 1726.) During a May 23, 2022, neurological evaluation, Mr. Koivula reported walking with a cane and that he experienced vertigo whenever he turned his head or body. (Tr. 1487.) He demonstrated some abnormalities on examination, such as diminished sensation in his legs in a stocking distribution. (Tr. 1491.) His gait, however, was normal. (*Id.*)

On June 7, 2022, Mr. Koivula resumed physical therapy for a gait abnormality and left leg pain. (Tr. 1620.) At a June 14, 2022, evaluation, Mr. Koivula was noted to have an antalgic gait but was able to ambulate with no assistive device, heel walk, toe walk, and move from a sitting to standing position. (Tr. 1609.) He had no tenderness in his back and denied spinal pain. (*Id.*) At a July 7, 2022, neurosurgery evaluation, Mr. Koivula's musculoskeletal examination was normal except for decreased sensation to soft touch in the left leg and left fingers. (Tr. 2222-24, 2236-37.)

On July 21, 2022, Dr. Toth completed a Stroke Medical Source Statement for Mr. Koivula. A complete summary of this opinion is in the "Relevant Non-Medical/Medical Opinion Evidence" section of this Report and Recommendation.

Regarding Mr. Koivula's use of a walker, his inpatient physical therapy records from March 2020 indicate that Mr. Koivula was being trained for walker management. (Tr. 445, 447, 448, 450.) As discussed earlier, Dr. Mahmood observed Mr. Koivula using a walker during a consultative examination but Mr. Koivula could walk around the examination room without the walker. (Tr. 1143.) Mr. Koivula reported to providers in April and June 2020 that he used a rollator walker. (Tr. 772, 1070.) He, however, denied using a walker in August 2021 (Tr. 1517, 2152) and May 2022 (Tr. 1504, 1703.)

Mr. Koivula also reported experiencing headaches that appear to be attributed to a "late effect of brain injury." (*See, e.g.*, Tr. 1086-87, 1090, 1098, 1244, 1329, 1334, 1343, 1352, 1564, 1588, 1600, 1613, 1645, 1652, 1662, 1669, 1722, 1732, 1741, 1751.) He initially reported a headache concurrently with the March 2020 stroke (*see, e.g.*, Tr. 277, 280, 281, 284, 286, 291) but then denied headaches until August 2020 (Tr. 772, 1070). At an endovascular appointment on August 25, 2020, Mr. Koivula reported having "occasional headaches that last for seconds." (Tr. 750). Then, on September 15, 2020, he reported "getting headaches at times." (Tr. 759.) At an October 9, 2020, Mr. Koivula described shooting pain in his temple once every three or four days and lasting for a few minutes. (Tr. 1082.) Dr. Battisti opined that Mr. Koivula's headaches may be a side effect of Mr. Koivula's use of nortiptyline. (Tr. 1085.) Therefore, Dr. Battisti began weaning Mr. Koivula from that medication. (*Id.*) Later that month and until January 2021, Mr. Koivula's headaches were listed as a side effect of his use of nortriptyline. (*See, e.g.*, Tr. 829, 835, 841, 846, 850, 856, 861, 866, 871, 876, 880, 885, 892, 928, 933, 937, 942, 946.)

At an initial consultation with a headache specialist on January 26, 2021, Mr. Koivula reported that his headache started a few days after his March 2020 stroke and that "his pain is stereotypical, not disabling." (Tr. 949.) He described the headaches as being two-second attacks of stabbing pain, two to three times per week, and further characterized them as not debilitating and with no triggers or associated symptoms. (*Id.*) On March 1, 2021, he denied experiencing frequent or severe headaches. (Tr. 1099; *see* Tr. 1142.) At Mr. Koivula's June 2021 consultative examination, he reported experiencing two headaches per week. (Tr. 1169.) However, on July 20, 2021, he denied frequent or severe headaches. (Tr. 2164, 2207.) Mr. Koivula reported symptoms of headaches in the context of an upper respiratory infection on December 27, 2021. (Tr. 1864.) On May 6, 2022, Mr. Koivula denied frequent or severe headaches at an examination. (Tr. 1743.)

On May 11, 2022, he reported a headache but also denied a headache during an examination. (Tr. 1724.)

### D. **Relevant Hearing Testimony**

#### 1. *Mr. Koivula's Testimony*

Mr. Koivula testified that he was unable to work due to difficulties with walking and vision. (Tr. 49.) Specifically, he testified that, immediately after his stroke, he was not able to walk at all. (*Id.*) Although he reported some improvement, he described continued difficulties walking outside, particularly on uneven terrain. (Tr. 49.) He said he uses a cane to help him walk and had a rollator walker. (*Id.*) He stated he uses the cane 50 percent of the time and the rollator walker 20 percent of the time. (Tr. 49-50.) He testified that his use of the cane or rollator changes depending on his pain level. (Tr. 54.) He stated that both his legs are weak. (*Id.*) He also reported that it is hard for him to bathe, put on socks, and put on underwear. (Tr. 50.) He must always grab a cart when he goes to the grocery store to prevent himself from "wobbling." (Tr. 51.) If he is "really bad," then he uses an automatic chair. (*Id.*)

Mr. Koivula also reported issues with vision. (Tr. 52.) Specifically, he reported double vision that impacts his reading, driving, or watching videos on his phone. (*See* Tr. 52-53.) He stated that his left eye is sensitive to light, making driving difficult. (Tr. 53.) He also testified that his stroke caused issues with swallowing. (*See* Tr. 57.)

#### 2. *Vocational Expert's Testimony*

The VE testified that Mr. Koivula's past relevant work was employment as a van driver, electronics assembler, taxi driver, interpreter, and auditor. (Tr. 60.) The ALJ asked the VE whether a hypothetical individual with Mr. Koivula's age, education, and work experience could perform work at the sedentary exertional level if also limited to never climbing ladders, ropes, or scaffolds;

and occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (*Id.*) The ALJ added that this individual should avoid unprotected heights, heavy machinery, rough, or uneven terrain except for the occasional climbing of ramps and stairs, wet surfaces, and commercial driving. (Tr. 60-61.) This individual can also understand, remember, and carry out simple instructions and routine, repetitive tasks; cannot perform work requiring a specific production rate; and can meet production requirements that allow a flexible and goal-oriented pace; can maintain focus, persistence, concentration, pace, and attention to engaged in such tasks for two-hour increments for eight-hour workdays within the confines of normal work breaks and lunch periods; can deal with occasional changes in responsibilities and expectations in a routine working setting; and can tolerate occasional interaction with supervisors, coworkers, and the general public, but contact still includes what is necessary for general instruction, task completion, or training. (Tr. 61.) The VE opined that this individual could not perform Mr. Koivula's past relevant work but could perform work as a document preparer, circuit board assembler, and address clerk. (*Id.*)

The ALJ then asked whether an individual with the same limitations from the first hypothetical could perform the same opined jobs if they required a cane for ambulation. (Tr. 62.) The VE stated that the jobs would remain the same. (*Id.*) The ALJ asked the VE about an employer's tolerance for off-task behavior and absences. (*Id.*) The VE opined that an employer would tolerate up to 10% off-task behavior during the workday and 6 absences per year. (*Id.*)

Mr. Koivula's counsel asked the VE whether a need for a walker or a rollator to stand/walk would be work-preclusive. (Tr. 63.) The VE opined that there would be no jobs available if the individual had this limitation. (*Id.*) Mr. Koivula's counsel then asked whether an individual could perform work if he would be absent one day per week. (*Id.*) The VE opined that this limitation would be work-preclusive. (*Id.*)

## IV.    ALJ'S DECISION

The ALJ first found that Mr. Koivula meets the insured status requirements of the Social Security Act through September 30, 2023. (Tr. 18.) The ALJ then found that Mr. Koivula has not engaged in substantial gainful activity since March 2, 2020, the alleged disability onset date. (*Id.*) The ALJ further found that Mr. Koivula has the following severe impairments: status post cerebral vascular accident due to right vertebral artery dissection – occlusion; hemiplegia; obesity; diabetes mellitus; left eye keratoplasty and glaucoma; neuropathy; lumbar degenerative disc disease; major depressive disorder; cervical stenosis; and a generalized anxiety disorder; (Tr. 18-19.) However, the ALJ determined that none of Mr. Koivula's impairments—either individually or in combination—met or medically equaled the severity of a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 19-21.)

The ALJ determined that Mr. Koivula retained the residual functional capacity ("RFC") to perform work at the sedentary exertional level except he is unable to climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; should avoid tasks requiring precise depth vision like threading a needle or repairing a watch; and should avoid unprotected heights, heavy machinery, rough or uneven terrain except for occasional climbing of ramps and stairs, wet surfaces, and commercial driving. (Tr. 21-22.) The ALJ also determined that, mentally, Mr. Koivula can understand, remember, and carry out simple instructions and routine, repetitive tasks; cannot perform work which requires a specific production rate; can meet production requirements that allow a flexible and goal-oriented pace; can maintain the focus, persistence, concentration, pace, and attention to engage in such tasks for two-hour increments for eight-hour workdays, within the confines of normal work breaks and lunch periods; and is able to deal with occasional changes in a routine work setting. (Tr. 22.) The ALJ further

determined that Mr. Koivula could tolerate occasional interaction with supervisors, coworkers, and the general public. (*Id.*) The ALJ also determined that Mr. Koivula also required a cane for ambulation. (*Id.*)

The ALJ found that Mr. Koivula is unable to perform any past relevant work. (Tr. 28.) The ALJ then determined that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Mr. Koivula is not disabled within the meaning of the Social Security Act. (Tr. 28.) The ALJ found that considering Mr. Koivula's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Mr. Koivula can perform, including employment as a document preparer, circuit board assembler, and address clerk. (Tr. 28-29.) Accordingly, the ALJ concluded that Mr. Koivula has not been under a disability, as defined in the Social Security Act, from March 2, 2020, through the date of the ALJ's decision. (Tr. 30.)

## V.    LAW AND ANALYSIS

### A.  Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  Standard for Disability

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments,

meets or equals any of the listings in 20 C.F.R. § 404, Sbpt. P, App. 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C. <u>Analysis</u>

#### 1. *The ALJ inadequately assessed whether Mr. Koivula's impairments satisfied Listing 11.04.*

Mr. Koivula argues that the ALJ's determination that his impairments did not meet or equal a Listing, specifically Listing 11.04, is not supported by substantial evidence. To meet a listing, the claimant "must satisfy all of the [listing's] criteria." *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 688225, at *3 (6th Cir. Aug. 10, 2020). The claimant "bears the burden of showing that an impairment meets or equals a listed impairment." *Id.* If the ALJ's listing finding is supported by substantial evidence, based on the record as a whole, the Court will defer to the ALJ's finding, "[e]ven if the record could support an opposite conclusion." *Id.* at *4. Moreover, if the ALJ's listing finding is not supported by substantial evidence, the error is harmless if the claimant cannot show that his impairments met or medically equaled a Listing. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).

Listing 11.04 addresses vascular insult to the brain, which is "commonly referred to as stroke or cerebrovascular accident." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(l)(1). Listing 11.04 is separated into three categories as follows:

A. Sensory or motor aphasia resulting in ineffective speech or communication (see 11.00E1) persisting for at least 3 consecutive months after the insult; or

B. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult; or

C. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a) and in one of the following areas of mental functioning, both persisting for at least 3 consecutive months after the insult:

1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
2. Interacting with others (see 11.00G3b(ii)); or
3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
4. Adapting or managing oneself (see 11.00G3b(iv)).

*Id.* at § 11.04. Relevant to 11.04(A), "[i]neffective speech or communication means there is an extreme limitation in your ability to understand or convey your message in simple spoken language resulting in your inability to demonstrate basic communication skills, such as following one-step commands or telling someone about your basic personal needs without assistance." *Id.* at § 11.00(E)(1). In § 11.04(B), "[d]isorganization of motor function means interference, due to your neurological disorder, with movement of two extremities." *Id.* at § 11.00(D)(1).

Here, the ALJ addressed Listing 11.04, stating:

Although the claimant's representative argued that this Listing was met, the record does not support such extreme limitations in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities or marked limitations in physical functioning plus marked limitation in one of the "paragraph B" criteria, as will be more fully discussed below.

(Tr. 20.)

18

As an initial matter, to the extent Mr. Koivula argues that his combination of impairments medically equaled Listing 11.04 (ECF No. 7, PageID#2294-95), this argument is not well-taken. To make a finding of medical equivalence at Step Three, an ALJ must have either: (1) a prior administrative finding from an agency doctor that supports the finding of medical evidence; (2) evidence from a medical expert obtained at t hearing level supporting the medical equivalence finding; or (3) a report from the Appeals Council medical support staff to support the finding of medical equivalence. *See Strittmatter v. Kijakazi*, No. 5:22-CV-00692, 2023 WL 207907, at *6 (N.D. Ohio Jan. 17, 2023) (citing SSR 17-2p, 2017 WL 3928306, at *3). As the claimant, Mr. Koivula bears the burden to bring forth evidence establishing that his impairments are medically equivalent to a listed impairment. *See, e.g.*, *Lett v. Colvin*, 1:13-CV-2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).

Here, Mr. Koivula, represented by counsel, fails to direct this Court's attention to *any* state agency findings or medical expert evidence supporting medical equivalence and merely asserts that his impairments medically equal Listing 11.04. (*See* ECF No. 7, PageID#2294-95.) And as the Commissioner points out, Mr. Koivula has not "argued that the record was somehow incomplete." (ECF No. 9, PageID#2324.) In fact, Mr. Koivula's counsel at the administrative hearing confirmed the record was complete. (Tr. 41.) Thus, Mr. Koivula does not meet his burden in establishing medical equivalence.

Mr. Koivula argues that the ALJ "failed to cite any medical evidence which either supported or was contrary to the relevant Listing." (ECF No. 7, PageID#2291.) As the Commissioner concedes and as demonstrated above, the ALJ's Step Three analysis is perfunctory. (*See* Tr. 20.) This perfunctory analysis, however, may not necessarily be error. That is because "[i]t is well-established that a reviewing court conducts a holistic review of the ALJ's decision and

may look to findings elsewhere in the opinion to support Step Three conclusions." *Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) (citing *Immke v. Saul*, No. 1:18CV2218, 2020 WL 1940849, at *6 (N.D. Ohio Apr. 22, 2020)); *see Scott v. Kijakazi*, No. 4:22CV878, 2023 WL 4010687, at *8 (N.D. Ohio June 15, 2023) (collecting cases). "Moreover, it is also well-established that as long as the ALJ cited substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision." *Anderson*, 2022 WL 4545188, at *2 (citing *Ulman v. Commissioner of Social Security*, 693 F.3d 709, 713-14 (6th Cir. 2012)). Conversely, an ALJ's failure to support her conclusory Step Three finding is not harmless where the claimant puts forward sufficient evidence to meet the Listing. *See Reynolds*, 424 F. App'x at 416. The Commissioner contends that "the decision as a whole provides ample support for the ALJ's conclusions[.]" (ECF No. 9, PageID#2322.)

Reading the decision as a whole and with common sense, the ALJ provided substantial evidence throughout his decision supporting that Mr. Koivula did not satisfy Listing 11.04(B). *See Labelle v. Comm'r of Soc. Sec.*, No. 3:20-cv-2644, 2021 WL 8342835, at *8-9 (N.D. Ohio Dec. 1, 2021), Further, Mr. Koivula does not raise substantial question as to whether he met Listing 11.04(B)'s requirements. As reproduced above, to meet these requirements of Listing 11.04(B), Mr. Koivula had to demonstrate "disorganization of motor function in two extremities…resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(l)(1). An "extreme limitation" is the inability to stand from a seated position, maintain balance while standing and walking, or use the upper extremities to independently initiate, sustain, and complete work-related tasks. *Id.* § 11.00D2. An "inability" to stand or maintain balance means the need for assistance from another person or the

use of an assistive device, "such as a walker, two crutches, or two canes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00D2a-b.

Here, Mr. Koivula does not demonstrate that he has an extreme limitation that meets this subsection's requirements. Specifically, he does not establish that he requires the use of an assistive device such as a walker. In fact, although Mr. Koivula presented with a walker at his consultative examination with Dr. Mahmood, he notably ambulated around the room without this walker. And, as will be discussed in more detail below, the ALJ rejected Dr. Mahmood's opinion that Mr. Koivula required the use of a walker because of incongruencies in Dr. Mahmood's opinion. Significantly, despite opining that Mr. Koivula required a walker for short distances, Dr. Mahmood also inconsistently opined that Mr. Koivula could frequently carry 55 pounds. Mr. Koivula cites instances from his March 2020 post-CVA rehabilitation where he used a walker and a single notation from June 2021 where he used a walker at his consultative examination.  But as the ALJ correctly concluded, "there is no evidence that [Mr. Koivula] required the use of a rolling walker." (Tr. 25.)

Moreover, the use of a single cane does not satisfy the requirements of Listing 11.04(B). *Boone v. Kijakazi*, No. 1:21CV1453, 2023 WL 2153847, at *7 (N.D. Ohio Feb. 22, 2023) ("[I]t is clear that use of a single cane, standing alone, is not sufficient to demonstrate disorganization of motor function in two extremities, resulting in an extreme limitation in either the ability to stand up from a seated position or the ability to balance while standing or walking."); *see also Smith v. Comm'r of Soc. Sec.*, No. 3:21 CV 2310, 2023 WL 2704161, at *3 (N.D. Ohio Mar. 30, 2023).

Beyond the discussion of Mr. Koivula's use of a walker, the ALJ's RFC discussion also includes substantial evidence supporting that Mr. Koivula did not have an extreme limitation that met Listing 11.04(B)'s requirements. This RFC discussion included an assessment of the

cumulative medical, non-medical, and medical opinion evidence. For example, the ALJ noted that in June 2021, Mr. Koivula's physical therapist noted that despite Mr. Koivula's continued symptoms of vertigo, balance issues, and left lower extremity weakness, his physical limitations had improved. (Tr. 23; *see* Tr. 1140.) Even with an antalgic gait and using a cane, Mr. Koivula's orthopedist reported that he was able to ambulate in casual shoes. (Tr. 23; *see* Tr. 2137.) Mr. Koivula reported no new balance problems at an October 6, 2021, appointment for diabetes, hypersomnia, and moderate episode of recurrent major depressive disorder.[5] (Tr. 23; *see* Tr. 2016.) Despite Mr. Koivula's report in December 2021 that he was still experiencing some weakness in his legs, Mr. Koivula also reported that overall he was feeling "good overall." (Tr. 23; *see* Tr. 1895.) At a neurological evaluation in May 2022, he walked normally, including toe walking and heel walking, and he rose from a chair without his arms. (Tr. 24; *see* Tr. 1664.) Finally, in June 2022, Mr. Koivula's physical therapist stated that he was able to walk on his heels and toes and move from sitting to standing, despite an antalgic gait. (Tr. 24; *see* Tr. 1609.) He also denied spinal pain. (*Id.*) Given this evidence, Mr. Koivula does not raise a "substantial question" that he meets Listing 11.04(B)'s requirements.

Mr. Koivula challenges the ALJ's Listing 11.04(B) analysis on the basis that the ALJ's RFC discussion "reviewed evidence and presented incomplete and inaccurate snapshots of Plaintiff's limitations." (ECF No. 7, PageID#2292.) To the extent that he is raising a "cherry picking" argument, this claim lacks merit. Although some evidence supports that Mr. Koivula had greater limitations due to his impairment, there is "little indication that the ALJ improperly cherry

---

[5] Mr. Koivula appears to take issue with the ALJ's reliance on this finding because it was not from an orthopedic specialist. Regardless of whether this statement was not made to an orthopedic specialist, he does not appear to dispute the fact that he reported *no* balance issues at this appointment.

picked evidence; the same process can be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

Throughout the decision, the ALJ discussed evidence favorable to Mr. Koivula's position. This included discussion of issues involving vertigo, balance issues, left extremity weakness, antalgic gait, and joint space narrowing. (*See generally* Tr. 23-24.) Yet, the ALJ also discussed findings from these same records that were unfavorable to Mr. Koivula's position, such as reports of feeling "good overall" despite leg weakness, improvement of physical abilities despite description of vertigo, balance issues, and left lower extremity dysfunction, and the ability to walk despite his antalgic gait and occasional use of a cane. (*See generally id.*) Although Mr. Koivula prefers that the ALJ provided greater discussion of evidence favorable to him, there is no requirement that the ALJ meticulously discuss each piece of evidence. *See Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("[A]n ALJ is not required to discuss all the evidence submitted."); *Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 195 (6th Cir. 2020) ("An ALJ need not discuss every piece of evidence in the record for the ALJ's decision to stand."). Thus, Mr. Koivula's "cherry picking" argument lacks merit and raises no substantial question that he meets the requirements of Listing 11.04(B).

Mr. Koivula argues in the alternative that substantial evidence does not support that he did not meet the requirements of Listing 11.04(C). Specifically, he argues that he "had a marked limitation in his ability to independently initiate, sustain, and complete work-related physical activities cause by the residuals of his stroke along with loss of vision and other impairments." (ECF No. 7, PageID#2293.) He contends that the record establishes that he has a marked limitation in his ability to complete his activities of daily living. (*Id.* (citing Tr. 739, 1191, 1172-73, 1191,

1726, 1895)). He also argues that he has marked limitations in his ability to maintain concentration, persistence, or pace and in his ability to adapt or manage oneself. (*Id.* at PageID#2294.)

The ALJ found that Mr. Koivula did not meet Listing 11.04(C) because the record does not support "marked limitations in physical functioning plus marked limitation in one of the 'paragraph B' criteria[.]" (Tr. 20.) The ALJ then referenced her Listings 12.04 and 12.06 findings of no more than moderate limitations for all the paragraph B criteria as support that Mr. Koivula did not have marked limitations in the paragraph B criteria. (*Id.*) In relevant part, the ALJ assessed the severity of those limitations as follows:

> The third functional area is concentration, persistence, or pace. In this area, the claimant has a moderate limitation. He is able to shop for himself and negotiate travel in public areas. He manages his own finances, and he can complete a wide range of daily activities. While he endorsed significant problems with attention, concentration, and short-term memory, the progress notes submitted by his treating physicians do not describe significant cognitive abnormalities during periods of medication compliance (Exhibit 7F, pg. 5, Ex. 16F, pgs. 7, 46, 62, 124, 198, 263, 413, 509, 605, Ex. 18F, pg. 9). Similarly, the results of a mental status examination estimated average to low average intellectual functioning (Exhibit 8F). The undersigned finds that this is consistent with the record as a whole, which indicates that the claimant has moderate limitations in sustaining focus, attention, and concentration sufficiently long enough to permit the timely and appropriate completion of tasks commonly found in work settings. Exhibits 2E-3E, 8F, and Hearing testimony

> The fourth functional area is adapting or managing oneself. In this area, the claimant has a moderate limitation. The claimant has no significant mental impediments to attending to his personal care needs, including dressing, bathing, hair care, shaving, eating, and toileting. Per the claimant's testimony, his activities of daily living are hindered mainly by his physical condition. Discussed in more detail below, the progress notes submitted by his treating physicians do not include a description that he requires assistance with daily activities or that he is unable to independently make or fulfill plans. Exhibits 2E-3E, 8F, and Hearing testimony

(Tr. 20-21.)

Here, Mr. Koivula does not raise a substantial question as to whether he met the requirements of Listing 11.04(C). Mr. Koivula alleges that he has a marked limitation in his ability

24

to maintain concentration, persistence, or pace because he "had significant cognitive abnormalities/memory deficit." (ECF No. 7, PageID#2294 (citing Tr. 748 (diagnosis of memory deficit following cerebral infarction), 765 (notation of immediate, short-term memory deficit), 1078 (notation that memory deficit may be related to adjustment disorder depression), 1186 (consultative examination observation that he displayed "some lapses in attention, which was viewed a function of his depressive disorder")).

Although Mr. Koivula cites evidence in support of the opposite conclusion, the ALJ cited ample substantial evidence in support of her conclusion that Mr. Koivula had no more than moderate limitations in this area of functioning. Specifically, the ALJ observed that Mr. Koivula can shop for himself, negotiate travel in public areas, and manage his own finances. (*See* Tr. 221-22, 1185.) And the progress notes cited by the ALJ demonstrate that Mr. Koivula did not have significant cognitive abnormalities during periods of medication compliance despite his reports of significant problems with attention, concentration, and short-term memory. (*See, e.g.*, Tr. 1171, 1609, 1648, 1664, 1726, 1800, 2015, 2207.) Moreover, as the ALJ noted, Mr. Koivula's mental status examination revealed average to low average intellectual functioning. (Tr. 1186.)

Mr. Koivula also does not establish that he has a marked limitation in his ability to adapt or manage oneself. He asserts that the "problems with his left hand affected his ability to adapt or manage himself." (ECF No. 7, PageID#2294 (citing Tr. 1081 ("Review of Systems" progress notes indicate complaints of left hand grip weakness)). Here, this argument is arguably waived because Mr. Koivula merely points to a single piece of evidence without demonstrating *how* this evidence demonstrates that he has a marked limitation in his ability to adapt or manage himself. (*See id.*) But even if this argument were not waived, the ALJ also cited evidence in support of her conclusion that Mr. Koivula had only moderate limitation in his ability to adapt or manage oneself.

Specifically, the ALJ acknowledged Mr. Koivula's testimony that his physical condition mainly hindered his activities of daily living. (Tr. 21.) However, the ALJ observed that "the progress notes submitted by his treating physicians do not include a description that he requires assistance with daily activities or that he is unable to independently make or fulfill plans." (*Id.*) Although the ALJ did not explicitly reference these progress notes in her analysis, the decision reflects the ALJ considered them. For example, the ALJ observed that Mr. Koivula exhibited mostly normal physical abilities despite using a cane to ambulate. (Tr. 23-25; *see, e.g.*, Tr. 1191, 1198, 1609, 1664, 1744, 2026.)

To demonstrate that the ALJ erred regarding the mental functioning area findings, Mr. Koivula had to demonstrate that no reasonable mind could have agreed with each of the ALJ's moderate limitations findings. *Biestek*, 139 S. Ct. at 1154. Although Mr. Koivula cites evidence that he proposes supports marked limitations, the ALJ also cited evidence demonstrating moderate limitations. The Sixth Circuit instructs that "[u]pon a finding that there is substantial evidence to support the ALJ's findings, we must affirm, and may not 'even inquire whether the record could support a decision the other way.'" *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 466 (6th Cir. 2017), quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (quoting *Smith v. Sec'y of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989)). Because Mr. Koivula does not demonstrate that he has a marked limitation in an area of mental functioning due to his mental impairment, he does not meet all the requirements of Listing 11.04(C). Accordingly, I recommend that the Court reject this assignment of error.

### 2. *The ALJ correctly applied SSR 19-2p and identified substantial evidence when evaluating Mr. Koivula's obesity.*

Mr. Koivula contends that the ALJ "failed to account for the combination of [his] obesity and the acknowledged related impairments" (*i.e.*, musculoskeletal, respiratory, cardiovascular and

endocrine disorders). (ECF No. 7, PageID#2294-95.) He asserts that these related impairments "could reasonably account for [his] statements regarding his symptoms. (*Id.* at PageID#2295.) Thus, he argues that the ALJ erred because the "combination of his symptoms and obesity further limited his ability to engage in work on a full-time and sustained basis." (*Id.*) This argument lacks merit.

Social Security Ruling ("SSR") 19-2p "provides guidance on how [SSA] establish[es] that a person has a medically determinable impairment of obesity," and how the SSA "evaluate[s] obesity in disability claims." SSR 19-2p, 2019 WL 2374244, at *1. Significantly, SSR 19-2p provides that "[t]he combined effects of obesity with other impairment(s) may be greater than the effects of each of the impairments considered separately," and that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment." *Id.* at *4; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016) (noting that SSR 02-1p, the predecessor to SSR 19-2p, "directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation") (citations omitted)

Here, the ALJ adequately considered Mr. Koivula's obesity as required by SSR 19-2p. The ALJ determined that Mr. Koivula's obesity was a severe impairment. (Tr. 18.) Then, when evaluating Mr. Koivula's symptoms and determining the RFC, the ALJ explicitly acknowledged her obligations under SSR 19-2p and explained that she considered the cumulative effects of Mr. Koivula's impairments, including his obesity. (Tr. 24.) Specifically, the ALJ observed that the "medical findings do not support the existence of limitations greater than the residual functional capacity" and "there is very little medical evidence in this case considering subjective description of his limitations." (*Id.*) The ALJ noted that to clarify the record as to the severity and functional

limitations of Mr. Koivula's symptoms and impairments from the alleged disability onset date moving forward, the agency requested a consultative examination. (*Id.*) The ALJ then proceeded to evaluate this medical opinion evidence that considered Mr. Koivula's obesity. (Tr. 24-25.) Notably, the ALJ considered and found partially persuasive the state agency findings of Dr. Siddiqui, who considered Mr. Koivula's obesity when rendering his findings. (Tr. 25; *see* Tr. 73, 84.)

Although Mr. Koivula argues that the ALJ "failed to account for the combination of [his] obesity and the acknowledged related impairments" and that these impairments "could reasonably account for [his] statements regarding his symptoms," SSR 19-2p only requires that the ALJ to "explain how [she] reached [her] conclusion on whether obesity causes any limitations." SSR 19-2p, 2019 WL 2374244, at *4. As demonstrated above, the ALJ complied with this requirement by evaluating the evidence and relying in part on the medical opinion evidence that accounted for Mr. Koivula's obesity.

Finally, Mr. Koivula, represented by counsel, advances no discernible argument as to *how* his obesity, singly or in combination with other impairments, *specifically* limited his ability more than the ALJ's RFC determination. Where a plaintiff disagrees that the analysis of obesity is adequate, he must meet the "burden of showing *specifically* how his obesity, in combination with other impairments, limited his ability to a degree inconsistent with the ALJ's RFC." *Foss v. Comm'r of Soc. Sec.*, No. 1:16cv1907, 2017 WL 2912524, at *8 (N.D. Ohio June 20, 2017), *report and recommendation adopted*, 2017 WL 2908857 (N.D. Ohio July 7, 2017) (emphasis added). Here, by failing to articulate such an argument, he did not meet this burden. Accordingly, I recommend that the Court reject this argument because it lacks merit.

### 3. The ALJ did not err in her evaluation of Mr. Koivula's headaches stemming from his late brain injury.

Mr. Kovula argues that the ALJ erred by finding his headaches non-severe and by not adequately considering them at later steps of the sequential evaluation process. (ECF No. 7, PageID#2297-2300.) The Commissioner asserts that substantial evidence supports the ALJ's evaluation of Mr. Koivula's headaches; the ALJ accounted for Mr. Koivula's headaches when determining the RFC; Mr. Koivula's headaches do not constitute a primary headache disorder; Mr. Koivula waived any argument that his headaches met any other Listing than Listing 11.04; and there is no continuous, 12-month period in which Mr. Koivula experienced headaches. (ECF No. 9, PageID#2326-28.)

Regarding headaches, the Social Security Agency promulgated SSR 19-4p to "explain [Agency] policy on how we establish that a person has a[ ] [medically determinable impairment] of a primary headache disorder and how we evaluate primary headache disorders in disability claims." SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019). The regulations require that the "[medically determinable impairment] be established by objective medical evidence from an acceptable medical source." Id. (footnotes omitted).

SSR 19-4p provides guidance regarding a Listings analysis for primary headache disorders, stating in part:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings);[ ] however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.[ ]
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *16.

As an initial matter, to the extent that Mr. Koivula argues that the ALJ erred by not considering whether his headaches met or medically equaled a Listing other than Listing 11.04, this argument is waived. That is because Mr. Koivula, represented by counsel during the administrative hearing, failed to allege at his hearing that his headaches satisfied any other Listing. *See, e.g.*, *McGeever v. Comm'r of Soc. Sec.*, No. 1:18-cv-477, 2019 WL 1428208, at *7 (N.D. Ohio Mar. 29, 2019) ("Where the claimant does not mention the particular Listing at the hearing before the ALJ, the Sixth Circuit has found that the ALJ is not obligated to discuss that particular Listing.") (collecting cases).

Next, Mr. Koivula argues that the ALJ erred by not analyzing his headaches under SSR 19-4p. (*See* ECF No. 7, PageID#2298). However, this argument is not well-taken because Mr. Koivula does not establish that his headaches are a primary headache disorder that require analysis under SSR 19-4p. SSR 19-4 provides that "only a primary headache disorder" qualifies as a medically determinable impairment ("MDI"). SSR 19-4p, 2019 WL 4169635, at *5. The SSA "will not establish secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection) as MDIs because secondary headaches are symptoms of another

underlying condition[,]" and instead, it "evaluate[s] the underlying medical condition as the MDI." *Id.*

Here, Mr. Koivula points to evidence regarding his headaches that illustrate that they are in fact secondary headaches. For example, he points to his January 2021 treatment note as evidence that his headaches were a severe impairment. It is true, as Mr. Koivula notes, that he reported that he was still experiencing sharp pain along his right temple since stopping his nortriptyline. (Tr. 1086.) Yet, he omits that this same treatment note attributed his headaches as a "late effect of [his] brain injury." (*Id.*) Notably, as the Commissioner points out, there are several other instances in the record supporting that Mr. Koivula experiences headaches as a late effect of his brain injury and thus indicate that he suffers from a secondary, not primary headache disorder. (*See, e.g.*, Tr. 1087, 1090, 1098, 1244, 1329, 1334, 1343, 1352, 1489, 1564, 1588, 1600, 1613, 1645, 1652, 1662, 1669, 1722, 1732, 1741, 1751.) Because SSR 19-4p does not apply to Mr. Koivula's secondary headache disorder, this argument is without merit.

Moreover, Mr. Koivula failed to establish a continuous, 12-month period in which he experienced headaches. While Mr. Koivula reported headaches at some points in the record, he also denied frequent or severe headaches. (*See, e.g.*, Tr. 1082, 1085, 1087, 1099, 1169, 1724, 1743, 1864, 2164, 2207.) Notably, Dr. Toth—Mr. Koivula's own treating provider—reported that Mr. Koivula did not experience headaches. (Tr. 2246.) Thus, Mr. Koivula fails to demonstrate that he satisfied the durational requirement.

Finally, Mr. Koivula argues the ALJ did not adequately consider his headaches at later steps in the disability sequential evaluation process. (*See* ECF No. 7, PageID#2299-300.) I disagree. Here, the ALJ found Mr. Koivula's headaches to be a non-severe impairment at Step Two. (Tr. 19.) Even if the ALJ erred in not finding Mr. Koivula's headaches to be severe

impairments, this does not constitute reversible error if the ALJ determined that Mr. Koivula had at least one other impairment at Step Two and continued to evaluate Mr. Koivula's severe and non-severe impairments under the remaining steps of the evaluation process. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). The ALJ here found Mr. Koivula's other conditions of status post cerebral vascular accident due to right vertebral artery dissection – occlusion; hemiplegia; obesity; diabetes mellitus; left eye keratoplasty and glaucoma; neuropathy; lumbar degenerative disc disease; major depressive disorder; cervical stenosis; and a generalized anxiety disorder were severe impairments at Step Two. (Tr. 18.) She then proceeded to account for Mr. Koivula's headaches when determining the RFC by relying, in part, upon medical opinion evidence that accounted for these headaches. (Tr. 25.) Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

### 4. *The ALJ appropriately evaluated the medical opinion of Dr. Mahmood.*

Mr. Koivula contends that the ALJ inappropriately evaluated the medical opinion of Dr. Mahmood. He does not challenge the ALJ's articulation of the supportability and consistency factors. Instead, he challenges the ALJ's evaluation of Dr. Mahmood's medical opinion regarding Mr. Koivula's use of a rollator walker. He argues that the ALJ should have assigned "controlling weight" (ECF No. 7, PageID#2330) to Dr. Mahmood's finding that Mr. Koivula required the use of a rollator walker because the ALJ failed to consider that an incongruency between Dr. Mahmood's conclusion that Mr. Koivula required the use of the walker and that he could lift 55 pounds "may be a typographical error as the remainder of the report demonstrated that [he] would need to use a rollator." (ECF No. 7, PageID#2329.) This argument is not well-taken.

First, it appears that Mr. Koivula's argument rests on outdated SSA regulations regarding medical opinion evaluation. The SSA revised its regulations for handling treating source evidence

32

for claims filed after March 27, 2017. *See* 20 C.F.R. § 416.927. Mr. Koivula's applications were filed on February 16, 2021—after March 27, 2017. Thus, the ALJ was not required to assign any weight—even controlling weight—to Dr. Mahmood's medical opinion. *See id.*[6]

Next, Mr. Koivula does not present *any* argument (*see* ECF No. 7, PageID#2301) disputing the incongruency between Dr. Mahmood's opinion that Mr. Koivula needed to use a rollator when walking short distances and his opinion that Mr. Koivula can frequently carry 55 pounds. (Tr. 1173). Indeed, Mr. Koivula merely argues that "[t]he ALJ failed to consider that this may be a typographical error as the remainder of the report demonstrated that [he] would need to use a rollator." (ECF No. 7, PageID#2301.) This unsubstantiated statement, as the Commissioner correctly points out, is "pure speculation." (ECF No. 9, PageID#2330).

Furthermore, Mr. Koivula also fails to address the ALJ's additional reason for rejecting Dr. Mahmood's opinion regarding Mr. Koivula's use of a rollator walker. Specifically, the ALJ determined that the record failed to fully substantiate that Mr. Koivula required the use of a rollator walker. Mr. Koivula's physical therapy records related to his post-CVA rehabilitation in March 2020 note that Mr. Koivula was being trained for walker management (Tr. 445, 447, 448, 450), and he used a walker when Dr. Mahmood examined him in June 2021 (Tr. 1173.) But the record does not otherwise document Mr. Koivula using a walker. Indeed, Mr. Koivula does not point to any instance in the record where a medical provider noted he required the use of a walker during routine treatment. There is no continuous, 12-month period in which Mr. Koivula used a walker that substantiates this RFC limitation. 20 C.F.R. §§ 404.1505, 404.1521, 416, 416.921. Thus, I

---

[6] Moreover, even if the prior regulations were applicable, the prior regulations require for the ALJ to assign controlling weight to the "*opinion of a treating source*…if he finds the opinion well-supported by the medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)(7) (internal quotation marks omitted) (emphasis added)). Here, Dr. Mahmood was an examining source, *not* a treating source.

find that the ALJ appropriately evaluated Dr. Mahmood's opinion and properly rejected this limitation. Accordingly, I recommend that the Court reject this argument.

### 5. *The ALJ did not err in not including a cane/rollator walker limitation in the RFC determination.*[7]

Mr. Koivula argues that the ALJ erred in his RFC determination by not including a limitation for a cane/rollator because "the record clearly established that [he] had left side weakness relating to his stroke." (ECF No. 7, PageID#2304.) Citing his testimony that he required a cane and a rollator walker, statements to his providers that he used a cane or rollator depending on his pain level, and indications in the record where he was observed to use a rollator walker, Mr. Koivula concludes that "an assistive device was needed for balance and weakness" and that the use of a rollator would "preclude[] him from the ability to perform even work at the sedentary level of exertion." (*Id.* at PageID#2304-05 (citing Tr. 49-50, 54, 341, 445, 609, 1173, 1623.)) This argument is not well-taken.

To the extent that Mr. Koivula is attempting to reassert his argument regarding the ALJ's rejection of Dr. Mahmood's opinion regarding his rollator walker use, this argument lacks merit. As stated above, the ALJ properly determined that Dr. Mahmood's opinion regarding the need for a rollator walker was not consistent or supported by the record. And to the extent that Mr. Koivula presents a SSR 96-9p argument, this argument still fails.

SSR 96-9p contains two requirements before an ALJ may conclude that a hand-held assistive device (*i.e.*, a cane/rollator walker) is "medically required." *Berry v. Saul*, No. 1:18-cv-01906, 2019 WL 4600433, at *9 (N.D. Ohio Sept. 23, 2019). First, "there must be medical documentation establishing the need for said device to aid in walking/standing." *Id.* Second, the

---

[7] Mr. Koivula, represented by counsel, appears to conflate Step Four and Step Five arguments in this assignment of error. Moreover, although he cites SSR 96-9p, he does not explain the ruling's requirements or explain how his cited evidence satisfies the ruling's requirements.

medical records must "also 'describe[e] the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information.'" *Id*. (quoting SSR 96-9p, 1996 WL 374185, at \*7). Courts in this district have repeatedly held that "documentation describing the circumstances for which [the assistive device] is needed is critical to establishing that it qualifies as a 'necessary device' under SSR 96-9p." *Spies v. Saul*, No. 19-CV-2928, 2020 WL 5044027, at \*16 (N.D. Ohio Aug. 26, 2020) (quotations omitted, alterations in original) (citing cases); *see also Fletcher v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-02217-CEH, 2022 WL 6156951, at \*18 (N.D. Ohio Oct. 7, 2022).

Here, Mr. Koivula fails to present the critical medical documentation establishing the medical necessity of his cane/rollator walker. To the extent that Mr. Koivula relies on his hearing testimony that he required the use of a cane and a walker, this does not satisfy SSR 96-9p's requirements. Courts have found that a claimant's testimony "does not qualify as 'medical documentation establishing the need for a cane under SSR 96-9p.'" *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at \*18 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom. Golden v. Comm'r of Soc. Sec.*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019); *see also Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA, 2023 WL 2988346, at \*7 (N.D. Ohio Mar. 22, 2023) (finding that claimant's and mother of claimant's testimony that claimant uses a cane or a walker "at virtually all times" did not satisfy SSR 96-9p's medical documentation requirement).

Mr. Koivula also appears to argue that his walker was medically necessary because the treatment notes reflect the use of a walker. But courts in this district have repeatedly held that SSR 96-9p "requires medical documentation of the need for the assistive device, not just notations relating to a claimant's continued use of an assistive device." *Wilson v. Saul*, No. 3:20-CV-00820-

JZ, 2021 WL 3516617, at *10 (ND. Ohio July 9, 2021), *report and recommendation adopted sub nom. Wilson v. Comm'r of Soc. Sec.*, 2021 WL 3510692 (N.D. Ohio Aug. 10, 2021); *see also Phillips v. Comm'r of Soc. Sec.*, No. 5:20-CV-01718-CEH, 2021 WL 5603393, at *10 (N.D. Ohio Nov. 30, 3021) ("Although various medical records note that Claimant presented at appointments using a cane, these notations do not meet the requirements of SSR 96-9p.").

Here, Mr. Koivula presents no clear argument regarding how his cited evidence satisfies the regulations' requirements. *See* Tr. 341 (post-CVA rehabilitation March 2020 note that his specialty equipment was a walker, wheel chair, and cane); 445 (post-CVA rehabilitation March 2020 note that Mr. Koivula was being trained for walker management); 609 (March 2020 notation that Mr. Koivula utilized a walker); 1173 (Dr. Mahmood's June 2021 physical examination finding that Mr. Koivula utilizes a walker to ambulate); 1623 (notation that Mr. Koivula reported that he "use[s] or ha[s] been advised to use a cane or walker to get around safely"). Specifically, this evidence does not describe the circumstances for which a walker is required. *See Lawrence v. Comm'r of Soc. Sec.*, No. 1:21-CV-01691-JG, 2023 WL 2246704, at *22 (N.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, 2023 WL 2242796 (N.D. Ohio Feb. 27, 2023). Thus, Mr. Koivula does not meet his burden in establishing that his walker/cane was medically necessary.

Mr. Koivula also appears to raise an intertwined Step Four/Step Five argument. He contends that the ALJ's overall RFC determination is not supported by substantial evidence because the VE improperly relied on a hypothetical that did not reflect all of his limitations (*i.e.*, that he required the use of a rollator walker). However, as discussed above, he fails to establish that the ALJ improperly rejected Dr. Mahmood's opinion that Mr. Koivula required the use of a

walker. And he fails to point to any documentation or evidence that satisfies SSR 96-9p's requirements for either his cane use or walker. Thus, he establishes no error.

Finally, reading the decision as a whole, the ALJ evaluated the medical, non-medical, and medical opinion evidence and provided an explanation for how she reached her conclusion that Mr. Koivula required only a cane for ambulation. (*See* Tr. 22-27.) Mr. Koivula may disagree with the findings, but he does not adequately demonstrate how the ALJ erred in her determination that he only required a cane for ambulation. Nor does he articulate a clear argument as to *how* the ALJ erred by finding him capable of performing work at the sedentary exertional level.

Mr. Koivula's approach of citing evidence that supports his position does not demonstrate that the ALJ's RFC determination lacks substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). So long as there is substantial evidence supporting the Commissioner's findings, a reviewing court must affirm regardless of the amount of substantial evidence that the claimant cites supporting the opposite conclusion. *See Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996). It is not a reviewing court's role to re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Because Mr. Koivula demonstrates no error in this regard, I recommend that the Court reject this assignment of error because it lacks merit.

## VI. RECOMMENDATION

For the foregoing reasons, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: May 30, 2024                          */s Jennifer Dowdell Armstrong*
                                             Jennifer Dowdell Armstrong
                                             U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates

Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).